COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Ortiz and Causey

WILLIAM SWANGO WILLIAMS, II

MEMORANDUM OPINION[*] BY
JUDGE DANIEL E. ORTIZ
v.    Record No. 1386-21-3    NOVEMBER 29, 2022

LYNCHBURG DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
James F. Watson, Judge

(Yvonne Z. Schewel, on brief), for appellant. Appellant submitting
on brief.

(Hope R. Townes; Lisa W. Vogel, Guardian *ad litem* for the minor
children, on brief), for appellee. Appellee and Guardian *ad litem*
submitting on brief.


William Swango Williams, II, appeals the circuit court's order terminating his residual

parental rights under Code § 16.1-283(C)(2) and approving the foster care goal of adoption for his

three children. Williams assigns error to the court's findings that the Lynchburg Department of

Social Services ("the Department") "made reasonable and appropriate efforts to remedy

substantially the conditions that led to the children's placement in foster care," that Williams was

"unwilling or unable" to remedy those conditions, and that termination of his parental rights was in

the children's best interests. We find no error and affirm the circuit court's judgment.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

Williams is the biological father of three minor children.[2] On January 23, 2020, the Department became involved, after receiving allegations that Williams' live-in girlfriend physically abused one of the children. Williams admitted that his girlfriend used drugs and abused the children. The Department provided Williams with parenting, counseling, and medication management services.[3] The Department initially sought to reunite the children with Williams. However, from January 2020 until July 2021, Williams repeatedly demonstrated that he was unstable and unwilling to change his dangerous behaviors. Thus, the Department changed its foster care goal from reunification to "relative placement," with the secondary goal of adoption, with the approval of the Juvenile and Domestic Relations District Court of the City of Lynchburg ("JDR court").

On February 21, 2020, Williams and his girlfriend broke up, and the children and Williams moved out. Williams was "very emotional" but stated that he "had to do what was best for the children." Three days later, the Department learned Williams overdosed on sleeping pills in a suicide attempt while home with the children. The Department took emergency custody of the children and placed them in foster care.

---

[1] We must unseal relevant portions of the record to resolve issues appellant raises. Only evidence and factual findings necessary to address the assignments of error are included in this opinion. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[2] The children were aged four, five, and six at the time of removal. The biological mother has not been involved in the children's lives since 2017.

[3] Williams had been receiving counseling and medication management services from Horizon Behavioral Health before the Department became involved, and the Department decided to use father's existing service providers for his convenience. During this time, Williams also took Suboxone for a previous opioid addiction.

To reunite with his children, the Department required Williams to complete a psychological assessment, address his mental health needs, maintain stable employment and housing, refrain from alcohol and drug abuse, and participate in visitation with the children. It also required Williams' active engagement in these services and requested that Williams be discerning "about the people he was allowing into his life, particularly his girlfriends."

Due to the pandemic, the Department initially scheduled virtual visitations with the children, twice per week. Beginning June 2020, it allowed in-person, supervised visitation at nearby parks. Williams' visits quickly became concerning. At his second in-person visit, Williams arrived forty-five minutes late, introduced the children to his new girlfriend—who had a history with child protective services ("CPS") and drug abuse—and asked them to call her "momma bear." Williams stated to the Department that his girlfriend's CPS history "was all false positives" and they would "work on sobriety together." He also left a subsequent visit early when the Department asked his new girlfriend to leave. Later, Williams told the Department that he "did not like" his counselor's therapy and did "not need parent coaching," as he "was a good father." He inconsistently engaged in services and only reached out to his parenting coach "when he wanted something."

Although the Department attempted to discuss visit and service expectations, Williams refused to meet. As a result, the Department canceled two of Williams' scheduled visits in August 2020. Only then, did Williams meet with the Department and agree to new parenting and counseling services. Despite his renewed engagement, the Department remained concerned about Williams. He remained unemployed, despite reporting six different employment opportunities. His

relationships remained turbulent.[4] And he failed to complete a psychological assessment with the Department's chosen provider.[5]

Nevertheless, Williams resumed visitations with the children. The Department began to allow unsupervised visits in October 2020, to demonstrate a good faith effort to work with Williams. It quickly became too cold to allow outdoor visitation. The Department suggested that visitations continue at its facility, but Williams refused, accusing the Department of being "satanic" and "falsely taking the children." He refused to work with the Department to find an alternate visit location. Because he insisted on visits in the park at night "when it was getting cold," the Department terminated his visitation.

After, the Department tried to contact Williams, as he failed to meet with his counselor.[6] The Department called and sent letters and text messages informing Williams that he needed to meet three times with his counselor, and once with the Department, before he could resume visitations. By the end of 2020, Williams had not complied with the Department's requests. Thus, the Department's goal changed from reunification to relative placement, with the secondary goal of adoption. It petitioned the JDR court in January 2021 to terminate Williams' parental rights. The children's relatives living in North Carolina petitioned for custody.

Williams told the Department that he would meet with his counselor for the three counseling sessions but would stop thereafter. Although his counselor encouraged compliance, Williams was "adamant that he did not need any parent coaching or counseling services." He resumed supervised visitation with his children in January 2021 for one hour per week at the Department's facility.

---

[4] Williams and his new girlfriend were engaged on July 15, 2020, and separated one month later. His previous girlfriend delivered their baby in September 2020.

[5] Instead, Williams obtained his own psychological assessment from Horizon Behavioral Health in June 2020.

[6] Although his counselor observed some visitations, Williams failed to attend counseling.

Even though the Department had changed its goal to relative placement, Williams promised the children "they were still coming home."

On March 24, 2021, Williams notified the Department that he had used cocaine, checked into a treatment program, and followed up with his substance abuse counselor. However, Williams continued to test positive for cocaine until May 11, 2021. When discussing his relapse and positive tests, Williams stated he would "fight for custody" and "it did not matter" whether it was in the children's best interest. He claimed it was "God's will" for him to have custody. On May 11, 2021, the Department visited Williams' home and found its condition "[v]ery concerning." It smelled "strongly of garbage" and had an "abundance of gnats." Williams' counselor also visited the home and observed "[t]here was stuff everywhere" and "your feet would literally stick to the floor."

During a visit on May 25, 2021, Williams told the children he would appeal custody "to [the c]ircuit [c]ourt and then to the President of the United States" so that they could come home.[7] The children were "very confused" about "where they were going." The Department intervened and reminded Williams that the current goal was relative placement. He became upset and left early, telling the Department that it "could not tell him how to parent . . . and that he would not listen." The Department, again, suspended visitation and required Williams to meet with the Department and his counselor. Williams replied that he "did nothing wrong" and would not "be corrected."

Nevertheless, Williams met with the Department on June 9, 2021. He told the Department that he would regain custody when the children were placed with their North Carolinian relatives and the Department was no longer involved. He stated that "no amount of counseling" would "make him change" and "he liked who he was." He added that he "was doing what he needed to jump through the hoops." After that meeting, Williams stopped responding to his counselor.

---

[7] Williams tested negative for all drugs, except his prescribed Suboxone, at his visit.

On July 14, 2021, the JDR court terminated Williams' parental rights[8] and approved the goal of adoption. Williams appealed that day. The following week, Williams posted on social media that he moved to California. When the Department asked whether he had moved, Williams reported he had not, posted on social media that he "found it funny to post little lies to confuse the government people," and attached screenshots of conversations with his counselor, including her cell phone number. His counselor subsequently refused to work with him.

The Department offered to provide a new counselor, and Williams replied that "no amount of psycho liberal therapy" would change him. He stated that he could "be patient and work with North Carolina." Despite this, he met with the new counselor but claimed that he only did the sessions "so that he could have visitation." He explained that his cooperation was a "ploy" to "trick[]the system." On September 10, 2021, Williams told his new counselor that "life wasn't worth living" and "the only separation between him and death was his motivation for his children." He stopped counseling six days later.

At the circuit court hearing, the Department showed that Williams failed to cooperate with the Department. His second counselor testified that Williams felt that "counseling was non-productive" and that he did not have "any problems." She testified that Williams did not benefit from her services, "there was definitely a lack of progress," and reunification seemed unlikely. Finally, she explained that she did not reach out to Williams' providers at Horizon because of Williams' concerns regarding trust.

Williams testified that he had "bipolar borderline personality," intellectual disability, post-traumatic stress disorder, and a mild substance abuse disorder. He testified that he received services for these conditions from Horizon Behavioral Health since January 2019, took medication,

---

[8] The JDR court terminated Williams' residual parental rights under Code § 16.1-283(B) and 16.1-283(C)(2); however, the circuit court proceeded under Code § 16.1-283(C)(2) only.

and met with his Horizon case manager every one or two weeks. He testified that he thought this case was due to his suicide attempt and that, because of his intellectual disability, he did not understand it concerned other issues, too. He added that his home had been cleaned, he was awaiting a decision about disability benefits, and he would comply with services moving forward. Finally, he testified that he did not want his rights terminated, as he hoped that "years down the road" they could "be a family again."

In closing, Williams argued that the Department's counselors were not "the right fit" for him, admitted that he was not ready to assume custody, and asked for "more time." Although the circuit court recognized Williams' love for his children, it found that, despite the Department's efforts, Williams was "unwilling or unable to remedy substantially the conditions that led to the children's placement in foster care," which had "required the continuation of the . . . placement." It concluded it was in the children's best interests to terminate father's parental rights under Code § 16.1-283(C)(2) and approve the foster care adoption goal. This appeal followed.

## ANALYSIS

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the [prevailing] party . . . ." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the Department was the prevailing party.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty.*

*Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Such "termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). The "'[r]easonable and appropriate' efforts" contemplated by Code § 16.1-283(C)(2) "can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338-39 (1992)).

Williams argues that the circuit court erred by terminating his parental rights under Code § 16.1-283(C)(2) because "the Department did not make reasonable and appropriate efforts to remedy the conditions that brought the children into foster care." Williams states he "was not unwilling to remedy the conditions." He claims the Department did not offer him visitation until almost three months after the children's removal. He also claims that "[t]he Department, after several unproblematic supervised visits, allowed *unsupervised* visits for several weeks, then suddenly cancelled *all visits*, simply because [he] didn't agree to continue his unsupervised visits in the [Department] building." He adds that the Department "made minimal effort to communicate with the father's ongoing providers at Horizon."

Despite these claims, the record reflects that the Department offered Williams virtual visitation when the children entered foster care, due to the COVID-19 pandemic, and Williams acknowledges that the pandemic "undoubtedly had an effect on this case." The record shows that the Department terminated Williams' visitation several times, due to its concerns regarding his new girlfriend's presence during visitation, his failure to meet with the Department, the appropriateness of his desired visitation location, and his conversations with the children. Additionally, Williams told the Department multiple times that he "would not listen," he did not need "parent coaching or counseling services," and "no amount of counseling" would "make him change." Williams' counselor also testified that he had not "been able to benefit from the services" that she provided. The Department "is not required to force its services upon an unwilling or disinterested parent." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 323 (2013) (quoting *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 243 (1982)); *see also Logan*, 13 Va. App. at 130. Under these circumstances, the circuit court was not plainly wrong in concluding that Williams was unwilling or unable to remedy the conditions which required the children remain in foster care and that the Department had made reasonable and appropriate efforts to help Williams cure these conditions.

Williams also maintains that terminating his parental rights is not in the children's best interests because they are "closely bonded" to him. "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." *Tackett*, 62 Va. App. at 319 (quoting *Logan*, 13 Va. App. at 128); *see also King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 211 (2018). Although the circuit court recognized that Williams loves the children, it found that termination of his parental rights was in their best interest. At the time of this hearing, the children had been in foster care for twenty-one months. Williams admitted that he was not

prepared to assume custody of the children but hoped that he could be reunited with them "years down the road." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett*, 62 Va. App. at 322 (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)).

In terminating Williams' parental rights under Code § 16.1-283(C)(2), the circuit court found that Williams had failed to remedy the conditions that led to the children's placement and continuation in foster care for nearly two years. Considering the totality of the circumstances, the circuit court did not err in terminating Williams' parental rights under Code § 16.1-283(C)(2). Regarding Williams' challenge to the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of his appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." *Toms*, 46 Va. App. at 265 n.3.

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

*Affirmed.*